Kathleen L. Wieneke, Bar #011139
Amy L. Nguyen, Bar #023383
STRUCK, WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
kwieneke@swlfirm.com
anguyen@swlfirm.com

*Attorneys for Defendants Pinal County, Paul Babeu and Heath Rankin*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christian Longoria, a single man, on behalf of himself as son of decedent Manuel O. Longoria, on behalf of all statutory beneficiaries of decedent Manuel O. Longoria; Joshua R. Wallace, as the personal representative of the Estate of Manuel O. Longoria; Manuel Longoria, Jr., a single man; Lynnette Longoria, a single woman; P.C.L., a minor; T.A.L., a minor; K.R.L., a minor; Sanisya Lott, a single woman; T.L., a minor; and A.L., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>Pinal County, a political subdivision of the State of Arizona; Paul Babeu, in his official capacity as Sheriff of Pinal County, Arizona; Heath Rankin, in his individual capacity as a Deputy Sheriff of Pinal County, Arizona,<br><br>Defendants. | NO. 2:15-cv-00043-SRB<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants Pinal County, Paul Babeu and Heath Rankin, through counsel and pursuant to Rule 56, Fed. R. Civ. P., move for summary judgment on the basis of qualified immunity on the § 1983 claim, and Arizona's justification immunity on the wrongful death claim, both arising from the death of decedent, Manuel Longoria ("Longoria"). Deputy Rankin is entitled to qualified immunity because a reasonable officer responding to a vehicle pursuit could have believed using deadly force was constitutionally

permissible against a desperate man known to be armed, who had minutes earlier threatened to kill Deputy Rankin (in addition to taunting police officers and targeting their cars during a circular "chase" lasting more than 38 minutes), refused to raise both hands and concealed one hand behind his back, and then pointed what Deputy Rankin reasonably perceived as a deadly weapon – a black/silver object – held with both hands while in the "shooting stance." Because Deputy Rankin is entitled to qualified immunity on the first prong of the analysis (the absence of a constitutional violation), all Defendants are entitled to summary judgment on all claims. Alternatively and at a minimum, Deputy Rankin is entitled to qualified immunity from any civil rights liability because a reasonable officer in his position could have believed his use of deadly force did not violate any clearly established law.

This Motion is supported by the following Memorandum of Points and Authorities and separate Statement of Facts ("DSOF").[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   FACTUAL BACKGROUND**

This lawsuit, filed by the family of a man determined to commit "suicide by cop," represents a refusal to accept the stark reality that it is Longoria – and only Longoria – who caused his own death by pointing a simulated gun while in the "shooting stance" directly at officers after continually refusing to obey officer commands to show his hands, threatening to kill Deputy Rankin, leading officers on a high-speed chase in a stolen car through the City of Eloy, and attempting to injure civilians and officers in the process. It was this behavior and the immediate, deadly threat posed by Longoria that compelled Deputy Rankin to make the split-second decision to shoot. The facts surrounding this decision overwhelmingly demonstrate the objective reasonableness of deadly force.

**A.   Longoria's Status as a Criminal Fugitive**

At the time of his death, Longoria was a fugitive on the run. On September 17,

---

[1] Defendants filed a Motion to Stay simultaneously with this Motion.

2

2012, Longoria pled guilty to Threatening and Intimidating (A.R.S. § 13-1202A.1) and was sentenced to probation. (DSOF ¶ 1). The conviction stemmed from Longoria's assault on an individual that obtained an Order of Protection against him. (Id.). A warrant was issued for Longoria's arrest on January 6, 2014, after he violated the terms of his probation. (Id.).

When Longoria was signaled to pull over by Eloy police on January 14, 2014, while driving a stolen car, he knew he would be:
- arrested on the outstanding arrest warrant;
- arrested for theft of the vehicle he was driving; and
- probably arrested for driving while impaired (he tested positive for cocaine).

(DSOF ¶¶ 1, 6, 27). This knowledge helps explain his erratic and desperate behavior and desire to commit "suicide by cop". *See Boyd v. City and County of San Francisco*, 576 F.3d 938, 944-45 (9th Cir. 2009) ("Cammerin's criminal history, particularly the two kidnapping attempts that provoked the high-speed chase and the potential sentence that he faced if prosecuted for those actions, made it more probable that Cammerin was trying to provoke a police shootout, rather than trying to surrender.").

### B. Police Chase

On January 14, 2014, Longoria was the driver of an automobile in Pinal County and failed to yield for law enforcement. (DSOF ¶ 2). But this was no ordinary police chase. Eloy police and members of the Pinal County Sheriff's Office pursued him for *at least* thirty-eight (38) minutes, at speeds up to 50 miles per hour in residential neighborhoods and school zones, charging his vehicle toward police cars and always returning to Main Street. (Id. ¶¶ 2, 9, 12). The Pinal County Sheriff's Office ("PCSO") dispatched information to its officers over its radio channel, Channel 1, which was audio recorded. (Id. ¶ 3). Deputy Rankin was monitoring the PCSO Channel 1 on his radio and received information about Longoria. (Id. ¶ 4). PCSO reported that Eloy PD was requesting assistance in pursuit of a vehicle going in circles. (Id. ¶ 5). Deputy Rankin and his partner, Deputy Rice, responded to the request for assistance. (Id.). PCSO alerted

officers that Longoria's car was reported as stolen out of Casa Grande. (Id. ¶ 6). Dispatch also advised that the "driver has a weapon" and "is armed". (Id.).

At one point during the pursuit, Longoria stopped and exited his vehicle near Battaglia and Main streets. (Id. ¶ 7). An officer radioed that Longoria was stopped and was "high risk," was "hiding his right hand," and would not comply with officer commands to raise his hands. (Id.). Longoria re-entered his vehicle and drove away, just as Deputy Rankin arrived. (Id.).

The next contact Deputy Rankin had with Longoria was a block west of Main on La Siesta, when Rankin and Rice pulled over and Longoria drove directly at them. (Id. ¶ 8, 12). Deputy Rankin got out of his vehicle and grabbed his rifle. (Id. ¶ 8). As Longoria drove past Deputy Rankin, he pointed something out of his driver's side vehicle window at Rankin. (Id.). Longoria also told Deputy Rankin: "Shoot me mother-fucker. I'm going to kill you." (Id.). Rankin ducked behind his patrol vehicle. (Id.). He then reported on the radio: "He pointed something at us in his right hand when he run by." (Id.).

Officers noted Longoria's speed was "about 50" in a residential area, that he hit a car on West 11th from La Siesta, and he was "driving very erratic" with people outside. (Id. ¶ 9). He also "attempted to ram about six law enforcement vehicles at this point." (Id.).[2] About fifteen minutes later, Deputy Rankin was instructed to go to Main and Battaglia because PCSO was going to set up a perimeter while Eloy PD was in active pursuit. (Id. ¶ 10). Deputies Rankin and Rice parked their car on the southeast corner of Battaglia and Main. (Id.). A map of the relevant Eloy streets reveals Longoria's design to provoke a confrontation. (Id. ¶ 12).

**C.    The Longoria-Provoked Shooting**

As captured by iPhone video, Longoria's vehicle was eventually disabled by stop-sticks just south of the Battaglia and Main intersection, resulting in a crash between police

---

[2] This conduct constitutes probable cause for the felonies of attempted aggravated assault (A.R.S. § 13-1204), endangerment (A.R.S. § 13-1201), and felony flight (A.R.S.§ 28-622.01).

4

1  cars and Longoria's car. (Id. at ¶ 11-12). Longoria quickly stepped out of the car while
2  keeping his right hand hidden. (Id. ¶ 11, 15). Deputy Rankin ran toward Main with his
3  rifle and saw Longoria standing up by the driver's side door of his vehicle. (Id. ¶ 13). He
4  positioned himself on the southwest corner of La Siesta and Main by the curb, and then
5  behind a deputy's patrol truck. (Id.). This position gave him a clear line of fire and
6  readily accessible concealment. (Id.). Rankin was approximately 30-40 feet away from
7  Longoria. (Id.). From his vantage point, Deputy Rankin saw Eloy Police officers
8  standing on the south side of the squad car with their weapons pointed at Longoria. (Id. ¶
9  14). They were shouting commands but Longoria refused to comply. (Id.).

10  Deputy Rankin saw the less lethal bean bag rounds hit and bounce off of Longoria,
11  and observed Longoria continue to act aggressively by waving his arm around and
12  refusing to comply with officer commands. (Id. ¶¶ 16-18). After Deputy Rankin yelled
13  commands, Longoria's right hand came up from the center waist area and made a
14  movement like he was swinging toward Rankin, with his right hand extended. (Id. ¶ 19).
15  Rankin saw something black or silver in Longoria's hand that was reflecting the sun.
16  (Id.). Rankin "thought he had a gun and [he] thought he was pointing it at [him] to kill
17  [him]." (Id.). Eloy PD's dash camera video captured Longoria holding an object in his
18  right hand. (Id.). At 50.76 seconds into the video, Longoria is seen in a "shooting stance"
19  – with his hands together raised to shoulder height, his left arm bent and his right arm
20  straight – in the direction of several officers, including Deputy Rankin. (Id. ¶ 20).
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

5

00:50.76/02:40.54

At 51.18 seconds into the video, two officers who were standing in the direction of Longoria's aim are seen ducking down. (Id. ¶ 21). Rankin also squatted down a little bit to avoid getting hit with a bullet. (Id. ¶ 22). He came back up and saw that Longoria was turning himself to other officers that were still giving commands. (Id.). Deputy Rankin fired two rounds from his rifle. (Id.). At 51.94 seconds into the video, just over one second after he took a "shooting stance", Longoria starts to fall to the ground after being shot twice by Deputy Rankin. (Id. ¶ 23). At the "very moment" the two bullets hit Longoria, he had turned around and put his hands in the air. (Id. ¶ 24). Longoria died from the gunshot wounds. (Id. ¶ 26).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.

### A. Standard of Review

Although the facts and inferences are drawn in favor of the non-moving party "*to the extent supportable by the record*," the reasonableness of Deputy Rankin's actions "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in

original). Additionally, the Fourth Amendment standard is one of objective reasonableness, and thus requires the use of force to "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must take into account that officers "are often forced to make split-second judgments…about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380-81 (reversing denial of summary judgment and holding that the lower court "should have viewed the facts in the light depicted by the videotape" of the incident because it plainly contradicted respondent's version of events). The video and audio recordings speak for themselves, and can be considered the "best evidence" of what happened during the incident. *See Hudspeth v. Shreveport*, 2006 WL 3747446, *2 (W.D. La. Dec. 18 2006), *affirmed,* 270 Fed. Appx. 332 (5th Cir. Mar. 19, 2008) ("There is simply no way to avoid the facts shown on the video-Mr. Hudspeth repeatedly brought up both hands with both arms extended in front of him in a universally recognized shooting stance, all the while holding a small silver colored object in his hands.").

### B. Deputy Rankin Is Entitled To Qualified Immunity on the Estate's Fourth Amendment Claim.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry is two-fold: (1) whether the facts as alleged show that the official's conduct violated a constitutional right; and (2) if so, whether the right violated was "clearly established." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have "sound discretion in deciding which of the two prongs of the

7

qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  However, first addressing whether a plaintiff has established a violation of a constitutional right "is often beneficial." *Id.*

Two recent Supreme Court cases deserve particular attention in evaluating Deputy Rankin's use of deadly force, *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014), and *City and County of San Francisco v. Sheehan*, 2015 WL 2340839 (May 18, 2015).  Like our case, *Plumhoff* arose from a police chase captured on video,[3] with the shooting officers' use of deadly force found both constitutional and not in violation of any clearly established law.  *Sheehan* involved the shooting of a mentally disabled woman, with the Court finding the deadly force constitutional despite the officers' confronting the woman without waiting for less intrusive alternatives.

### 1.     Deputy Rankin Did Not Commit a Fourth Amendment Violation.

In determining whether the force used was excessive, courts should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Scott*, 550 U.S. at 381.  The use of deadly force is reasonable "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" and, "where feasible, some warning has been given." *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985)).  This is a factually dependent test—the Fourth Amendment "does not require law enforcement officers to exhaust every alternative before using justifiable deadly force." *Forrett v. Richardson,* 112 F.3d 416, 420 (9th Cir. 1997).  Application of the *Graham* factors to the undisputed facts of this case makes clear that Deputy Rankin's use of force

---

[3] The district court's decision in *Plumhoff* involved a different case name, *Estate of Allen v. City of West Memphis*, 2011 WL 197426, at *1 (W.D.Tenn. 2011) ("a video camera [] recorded the events from the initial traffic stop through the entire sequence of events"), and it is apparent from the Supreme Court's *Plumhoff* opinion that it was reviewing this same video of the police shooting. 134 S.Ct. at 2021.

8

was objectively reasonable.

### a. *Severity of Crime and Resisting Arrest/Flight*

The first and third *Graham* factors – "severity of the crime at issue" and "whether the suspect is resisting arrest" – cut in Deputy Rankin's favor. Longoria was already known to have committed serious crimes and committed another serious offense just one second before he was shot. The chase began when law enforcement attempted to stop Longoria because he was reportedly driving a stolen vehicle, a serious criminal offense in and of itself. (DSOF ¶¶ 2, 6); *see also Coles v. Eagle*, 704 F.3d 624, 628-29 (9th Cir. 2012) (where officers had reason to believe the suspect had stolen a car, the severity of the crime factor weighed in favor of defendants). Longoria had already refused to stop his vehicle for law enforcement and engaged both the Eloy Police Department and the PCSO in a vehicular pursuit for *at least* thirty-eight (38) minutes before the shooting. (DSOF ¶2); *see also* A.R.S. § 28-622.01("A driver of a motor vehicle who wilfully flees or attempts to elude a pursuing official law enforcement vehicle that is being operated in the manner described in section 28-624, subsection C is guilty of a class 5 felony."). Longoria was also reported to have been armed. (Id. ¶ 6). At one point during the pursuit, Longoria stopped and exited his vehicle, hid his right hand behind his back and would not comply with officer commands to raise his hands. (Id. ¶ 7).

While driving past Deputies Rankin and Rice on La Siesta minutes before the shooting, Longoria pointed something in his right hand at Deputy Rankin and said: "Shoot me mother-fucker. I'm going to kill you." (Id. ¶ 8). He also rammed his vehicle into other cars, and drove it menacingly and repeatedly toward several police cars, as if engaged in a game of "chicken". Once Longoria was stopped just south of Battaglia and Main, he again refused officer commands to show both of his hands and, instead, placed his right hand behind his back, against his vehicle, as if holding something. (Id. ¶¶ 14-15, 18). Longoria's refusal to comply with commands continued even when less lethal force – bean bag rounds and taser – were used. (Id. ¶¶ 16-18). Longoria then simulated holding a weapon by taking a "shooting stance," with his hands together at shoulder level

9

holding something black or silver, pointed in the direction of several officers, including Rankin. (Id. ¶¶ 19-20). The video shows two officers duck down immediately after this occurred. (Id. ¶ 21). Longoria's conduct constitutes two separate acts of Aggravated Assault pursuant to A.R.S. §§ 13-1203(A)(2) & 1204(A)(8)(a). This same conduct also demonstrates that Longoria was resisting arrest, as the 38-minute chase kept police officers at bay and it was only through the deployment of stop sticks that Longoria was forced to stop fleeing. The severity of his crimes together with his resistance to arrest tip decisively in Deputy Rankin's favor.

### b. *Immediate Threat to Safety*

The second *Graham* factor – whether the suspect posed an immediate threat to the safety of the officers or others – is the "most important" factor and also weighs heavily in Deputy Rankin's favor. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). Before his vehicle crash, Longoria was in a vehicle pursuit for *at least* thirty-eight (38) minutes after he refused to stop for law enforcement while driving a stolen vehicle, threatened to kill officers, attempted to hit law enforcement vehicles, evaded police in heavily populated areas, and was believed to be armed with a weapon. (DSOF ¶¶ 2, 6, 9). Even before the final confrontation, Longoria had: (1) gotten out of his car while concealing his right hand and refusing to comply with officer commands; (2) driven past Deputy Rankin on La Siesta and, while pointing something in his right hand at the deputy, said: "Shoot me mother-fucker. I'm going to kill you;" and (3) collided with other cars, and attempted several times to ram police cars. (Id. ¶¶ 7-9).

Once Longoria was stopped, he again refused officer commands to show both of his hands and, instead, placed his right hand behind his back, against his vehicle, as if holding a gun. (Id. ¶¶ 11, 14-15). Longoria's refusal to comply with commands continued even when less lethal force – bean bag rounds and taser – were used. (Id. ¶¶ 16-18). Longoria then simulated holding a weapon by taking a "shooting stance", with his hands together at shoulder level holding something black or silver, pointed in the direction of several officers, including Deputy Rankin. (Id. ¶¶ 19-20). The video shows

two officers duck down immediately in response. (Id. ¶ 21). Deputy Rankin also briefly squatted down, believing Longoria had a gun and was going to shoot him. (Id. ¶ 19, 22).

Whether Longoria actually had a weapon in his hand is irrelevant, as Deputy Rankin had probable cause to believe he did. *See Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694 (1985) ("law enforcement officers may employ deadly force where the officer has *probable cause* to believe that the suspect poses a *threat of serious physical harm*, either to the officer or others."). As emphasized by the Ninth Circuit, "people confronted with what they believe is a deadly weapon cannot be expected to maintain a high level of critical perception." *United States v. Martinez-Jimenez*, 864 F.2d 664, 667 (9th Cir. 1989)), *cert. denied*, 109 S.Ct. 1576 (1989); *see also McLaughlin v. United States*, 476 U.S. 16, 17 (1986) ("the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue.");[4] *Dague v. Dumesic*, 286 Fed.Appx. 395, 396 (9th Cir. 2008) (reversing district court's denial of qualified immunity where officers shot suspect who made "a threatening movement with the hand he kept concealed….Whether or not officers' perception was in fact correct, their decision to shoot…is the type of 'split-second judgment' which we cannot second guess"); *George v. Morris*, 724 F.3d 1191, 1199 (9th Cir. 2013) ("When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force."); *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir.1996) ("The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists."); *Torres v. City of Madera*, 524 F.3d 1053, 1056 (9th Cir. 2008) (reasonableness analysis applies to honest mistakes); and *Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010) (deadly force was objectively

---

[4] This same reasoning of reasonable-but-mistaken perceptions has been applied by the Ninth Circuit to criminal cases involving a cell phone, *United States v. Michael*, 220 F.3d 1075 (9th Cir. 2000), a toy gun, *United States v. Faulkner*, 952 F.2d 1066, 1073 (9th Cir.1991), a road flare, *United States v. Boyd*, 924 F.2d 945, 947 (9th Cir.1991), and a pellet gun, *United States v. Smith*, 905 F.2d 1296, 1300 (9th Cir.1990). "[W]hether an object constitutes a dangerous weapon depends more on the object's ability to incite fear and violence because it appears to be dangerous than on its latent capability." *Michael*, 220 F.3d at 1076.

11

reasonable where student pointed a toy gun at officers).

The Sixth Circuit's decision in *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) is strikingly similar, involving a vehicle pursuit after the suspect refused to stop for law enforcement, with the suspect later colliding into another vehicle. *Id.* at 399. Refusing officer commands to "show his hands", the suspect "extended his arms and clasped his hands into a shooting posture, pointed at the officers." *Id.* at 400. When the suspect reached down and again made the same shooting posture, two officers fired at the suspect, and another volley of shots came one second later after the suspect made the same shooting posture. *Id.* The officers fired a total of 80 rounds, 23 of which struck the suspect. *Id.* No gun was ever found in the suspect's vehicle. *Id.* The Sixth Circuit reversed the district court's denial of qualified immunity, holding that the "totality of the circumstances clearly gave the officers probable cause to believe [the suspect] threatened their safety." *Id.* at 403. "That [the suspect] was actually unarmed and did not have a [concealed weapon] permit is beside the point; what matters is the reasonableness of the officers' belief as they 'did not and could not have known' otherwise." *Id.*

*Hudspeth* likewise involved a suspect who refused to stop for police and a resulting vehicle pursuit. Once stopped, the suspect got out of the vehicle and, "using a two handed shooting stance, pointed an object that [the shooting officer] was positive was a gun." 2006 WL 3747446, *2. The incident was captured on video and a still photograph shows the suspect in the shooting stance. *Id.* In response, one of the officers dove for cover, while another officer fired two shots at the suspect. *Id.* The suspect, again, pointed the object in his hands at the officer, which resulted in another round of shots from the officers. *Id.* The court found the video and still photographs to be particularly instructive on the issue of reasonableness and the application of qualified immunity because they clearly showed the suspect "pointing a perceived weapon using a shooting stance." *Id.* at *10, 12. Noting "the fact that Mr. Hudspeth was actually unarmed is not relevant to the determination of objective reasonableness," the court found the officers had probable cause to believe their lives were in danger, and their use of deadly force was objectively

reasonable under the circumstances. *Id.* at *14-15; *see also Ryburn v. Huff*, 132 S.Ct. 987, 991-92 (2012) (per curiam) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."); *Foster v. Carroll County*, 2011 WL 4386412, at *6 (N.D.Miss. 2011) ("Over an extended period of time Foster refused to surrender or throw down his weapon…They heard his threats to commit suicide. All attempts to reason with him over an extended period of time had been unavailing.").

From Deputy Rankin's perspective, and given the circumstances leading up to the standoff, Longoria posed a risk of death or serious bodily injury to the officers when he took a shooting stance with both hands at shoulder height pointed directly at officers while holding what reasonably appeared to be a gun. The law does not require Deputy Rankin to wait to positively confirm that Longoria did not have a gun in his hand. *See Hudspeth*, 2006 WL 3747446, at *15 ("In the time it would have taken the officers to distinguish whether Mr. Hudspeth had a real gun or a cell phone, Mr. Hudspeth could have fired multiple rounds at them.").

*c.     Other Factors*

Beyond the three *Graham* factors, it is also "appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability." *Scott*, 127 S.Ct. at 1779. Longoria exposed not only himself to a significant risk of death or bodily harm, but dozens of others who lay in his path as he circled downtown Eloy for more than 38 minutes. *Id.* ("It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop.").

That Longoria was troubled and irrational does not change the reasonableness of Deputy Rankin's use of deadly force. The Supreme Court recently rejected the notion that a plaintiff's expert can create triable issues with testimony criticizing an officer for failing

13

to respect the suspect's "comfort zone," and failing to employ "non-threatening verbal communication and open-ended questions to facilitate the subject's participation in communication." *Sheehan*, 2015 WL 2340839, at *10; *see also Saucier,* 533 U.S. at 216, n.6 (Ginsburg, J., concurring) ("'[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently'").

Given the totality of the undisputed facts, judged from the perspective of a reasonable officer on the scene that is forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances, Deputy Rankin's decision to use deadly force was objectively reasonable.

### 2. Even If Deputy Rankin Had Committed a Fourth Amendment Violation, the Right Was Not Clearly Established.

Qualified immunity allows for mistaken judgments and protects "all by the plainly incompetent or those who knowingly violate the law." *Peng v. Penghu*, 335 F.3d 970, 976 (9th Cir. 2003); *see also Brosseau v. Haugan,* 543 U.S. 194, 201 (2004). If officers of reasonable competence could disagree on whether an officer's conduct was lawful, qualified immunity applies. *See Malley v. Briggs*, 475 U.S. 335, 341 (1987); *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997). "The plaintiff bears the burden of proof that the right allegedly violated was clearly established." *Romero v. Kitsap Cnty.,* 931 F.2d 624, 627 (9th Cir. 1991). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034 (1987). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2083 (2011).

There is no clearly established right prohibiting an officer from using deadly force when confronted with a suspect simulating a deadly weapon in a shooting stance. To the contrary, "the Fourth Amendment does not require omniscience and absolute certainty of

14

harm need not precede an act of self-protection." *Graham*, 490 U.S. at 553 (quoting *Elliot*, 99 F.3d at 644); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (it is "too plain for argument" because "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."). As demonstrated above, case law consistently holds that an officer *can* use deadly force when faced with such a situation, *even if* it is later discovered that the suspect was unarmed. Thus, a reasonable officer would not understand that using deadly force in the circumstances presented here would violate an individual's Fourth Amendment right.

Plaintiffs claim that at the "very moment" Longoria was shot, he "finally complied and turned his back to officers while raising both hands into the air in a posture of surrender." (Doc. 14 at ¶ 28). But this argument improperly assumes that Deputy Rankin had enough time to perceive Longoria's change in movement and alter his course of action. The iPhone video and still photos conclusively show there was only 1-2 seconds, at most, between the time Longoria took the shooting stance and the time Deputy Rankin fired the first shot. (DSOF at ¶¶ 20, 23). Such a short perception-reaction time is certainly reasonable given the perceived threat.[5] Nor could Deputy Rankin be expected to know that Longoria was intending to surrender 1-2 seconds after taking the shooting stance. *See Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995) ("Perhaps Mr. Wilson intended to surrender. If so, his death is particularly tragic. However, the inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life. Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat.").

---

[5] *See, e.g. Berube v. Conley*, 506 F.3d 79, 81 (1st Cir. 2007) (officers were entitled to qualified immunity where they shot suspect "a matter of seconds" after suspect displayed a metal object in his hands); *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003) (officers were entitled to qualified immunity where officers shot unarmed woman with her hands raised over her head "within a split-second" of her throwing objects and a knife at the officers); *Dunklin v. Mallinger*, 2013 WL 1501446, at *5 (N.D. Cal. April 10, 2013) (.87 seconds between a perceived threat and the officer shooting does not deprive him of qualified immunity, "as the Fourth Amendment does not require that a public official's actions be perfectly calibrated as to timing.").

Moreover, the Supreme Court has recently suggested (repeatedly) that circuit precedent alone may be insufficient to create the type of "clearly established" precedent necessary to overcome qualified immunity. *See Taylor v. Barkes*, 135 S.Ct. 2042 (June 1, 2015) (*per curiam*); *Sheehan*, 2015 WL 2340839, at *9; *Carroll v. Carman,* 135 S.Ct. 348, 350 (2014) (*per curiam*); *Reichle v. Howards,* 132 S.Ct. 2088, 2094 (2012). Supreme Court precedent has convincingly shown that officers in Deputy Rankin's position may lawfully use deadly force in the context of dangerous pursuits to protect the lives of others, and certainly there is no "robust consensus of authority" suggesting that Deputy Rankin's conduct was either plainly incompetent or in knowing violation of the law. *See Scott*, 550 U.S. at 381; *Plumhoff*, 134 S.Ct. at 2021-22. Even when looking beyond Supreme Court precedent, circuit cases like *Pollard* and *Hudspeth* recognize that officers in Deputy Rankin's position may use deadly force when confronted with a suspect's simulated gun (*e.g*., a cell phone, a metal object)—and Supreme Court and Ninth Circuit precedent refuses to condemn an officer for reasonably but mistakenly perceiving a simulated gun to be an actual weapon. *See Martinez-Jimenez*, 864 F.2d at 667; *Dague*, 286 Fed.Appx. at 396; *McLaughlin*, 476 U.S. at 17. Thus, there was no clearly established right that universally put all reasonable officers on notice that Deputy Rankin's use of deadly force violated Longoria's constitutional right.

**C. Deputy Rankin's Use of Deadly Force Was Justified Under Arizona Law.**

For the same reasons that Deputy Rankin's use of deadly force was reasonable under the Fourth Amendment (Sction II.B.1 above), his use of force was justified under Arizona law, precluding Plaintiffs' state law claim. Under A.R.S. § 13-413, "No person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." Under A.R.S. § 13-410(C), "[t]he use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary…[t]o defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use

16

of deadly physical force." Just as the Ninth Circuit affirmed summary judgment on the wrongful death claim under Arizona law in *Marquez v. City of Phoenix*, 2012 WL 3937717, at *7 (9th Cir. 2012) ("no reasonable jury could find that the circumstances here failed to justify the use of deadly force"), Deputy Rankin's use of deadly force was justified because he reasonably believed it was necessary to "defend himself or a third person from … the use or imminent use of deadly physical force" by Longoria. *See also Garcia v. United States,* 826 F.2d 806, 812 & n. 14 (9th Cir. 1987) (applying Arizona law under Federal Tort Claims Act to conclude that an officer was justified in using deadly force to prevent a "felonious and deadly assault" on himself by a suspect attacking him with a stick and a rock).

A different Arizona statute, A.R.S. § 13-411(A), further justifies Deputy Rankin's use of deadly force "if and to the extent [he] reasonably believes that…deadly physical force is immediately necessary to prevent the other's commission of …second or first degree murder…or aggravated assault." Under this statute, Deputy Rankin is "presumed to be acting reasonably for the purposes of this section if the person is acting to prevent what the person reasonably believes is the imminent or actual commission of any of the offenses listed in subsection A of this section." A.R.S. § 13-411(C).

Deputy Rankin's belief that Longoria was about to shoot him or other officers in the area was reasonable and justified as a matter of law. The undisputed video evidence establishes that Longoria refused officer commands to show his hands and concealed one hand behind his back, then held his hands in a shooting stance pointing something black or silver directly in Deputy Rankin's direction, just over one second before he was shot. Any reasonable officer forced to make a split-second decision under these circumstances would surely conclude that deadly force is necessary. Deputy Rankin was, therefore, justified in using deadly force and cannot be held liable under Arizona law.[6]

---

[6] If Deputy Rankin's conduct is justified, Defendants are entitled to an award of attorneys' fees, costs and lost income under A.R.S. § 13-420.

### D. **Defendants Pinal County and Sheriff Babeu Cannot Be Held Liable.**

#### 1. **Fourth Amendment Claim**

42 U.S.C. § 1983 does not permit *respondeat superior* liability against a governmental entity, *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978), but where there is no constitutional deprivation, there can be no municipal liability. *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008); *see also Pollard*, 780 F.3d at 401 ("[T]he constitutional violation of a municipal official is a prerequisite to municipal liability."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point"). Consequently, because the Estate cannot prove that Deputy Rankin violated decedent's constitutional rights, its *Monell* and suspervisory claims against Pinal County and Sheriff Babeu necessarily fails as a matter of law. *Id*.

#### 2. **State Law Wrongful Death Claim**

The sole theory of liability asserted against Pinal County and Sheriff Babeu on the wrongful death claim is vicarious liability under the doctrine of *respondeat superior*. (Doc. 14 ¶¶ 7-8). However, where there is no liability attributed to the acts and omissions of the employee, there can be no vicarious liability imputed to the employer. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 42, 734 P.2d 580, 184 (1987) (*en banc*). Thus, because Deputy Rankin's use of deadly force was justified under Arizona law, it necessarily follows that no liability can be imputed to Pinal County or Sheriff Babeu, and the wrongful death claim against them must be dismissed as a matter of law.

### III. **CONCLUSION**

Because Deputy Rankin's use of deadly force was both constitutional under the Fourth Amendment and justified under Arizona law, Defendants are entitled to summary judgment on all claims. Defendants are also entitled to fees and costs pursuant to A.R.S. § 13-420.

DATED this 27th day of July, 2015.

STRUCK WIENEKE & LOVE, P.L.C.

By: */s/Amy L. Nguyen*
    Kathleen L. Wieneke
    Amy L. Nguyen
    3100 West Ray Road, Suite 300
    Chandler, AZ 85226
    Attorneys for Defendants Pinal County,
    Paul Babeu and Heath Rankin

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27th, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Joel B. Robbins
Anne E. Findling
ROBBINS & CURTIN, PLLC
301 East Bethany Home, #B-100
Phoenix, AZ 85012
Attorneys for Plaintiffs Manuel Jr. and Christian Longoria

Joseph M. Leal III
COLE & LEAL
420 West Casa Grande Lakes Boulevard N.
Casa Grande, AZ 85122
Attorneys for Plaintiff Lynnette Longoria

Marc D. McCain, Esq.
Darius Bursh, Esq.
Mc CAIN & BURSH, PLC
7420 East Pinnacle Peak Road, #124
Scottsdale, AZ 85255
Attorneys for Plaintiff Sanisya Lott

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

*/s/Kim Penny*
3074421